NOT DESIGNATED FOR PUBLICATION

No. 126,668

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of A.G., a Minor Child.

MEMORANDUM OPINION

Appeal from Leavenworth District Court; DAN K. WILEY, judge. Submitted without oral argument. Opinion filed March 1, 2024. Affirmed.

*Chadler E. Colgan*, of Colgan Law Firm, LLC, of Kansas City, for appellant natural mother.

*Ashley Hutton*, assistant county attorney, and *Todd Thompson*, county attorney, for appellee.

Before SCHROEDER, P.J., CLINE and HURST, JJ.

PER CURIAM: Mother appeals the termination of her parental rights to her minor child, A.G., based on the district court's findings that she was unfit to parent her child under K.S.A. 38-2269(c)(2) and (c)(3). After a careful review of the record, arguments on appeal, and legal authorities, we affirm the district court's judgment.

FACTS

On January 31, 2020, the State filed a child in need of care (CINC) petition and ex parte order of protective custody to remove A.G. (born in 2014) from Mother's home in Leavenworth. The State's filings noted the Kansas Department for Children and Families (DCF) removed A.G. from Mother's care after A.G. arrived at school with bruises on her face, which she reported occurred after a man whom A.G. called her stepfather struck her in the face and told A.G. he would cut open her belly. Mother did not cooperate with

1

investigators and told A.G. to say the man A.G. called her stepfather, with whom A.G. and Mother were living, had accidentally hit her. The CINC petition also alleged A.G. was in need of care because of concerns that Mother was using drugs and Mother's refusal to take a drug test. It noted Mother had just regained custody of A.G. in July 2019. Before then, A.G. had been living with her grandfather.

The district court granted the motion for protective custody the same day, placing A.G. in DCF custody and scheduling a temporary custody hearing for February 4, 2020. Following the temporary custody hearing, the district court found probable cause to believe that the allegations in the CINC petition were true. The court ordered A.G. to remain in DCF custody and for any visitation by Mother to be contingent upon negative urinalysis (UA) results.

After several continuances due to the COVID-19 pandemic, the district court held an adjudication hearing on August 26, 2020. After considering the evidence presented by the State—which consisted in part of court reports prepared by Cornerstones of Care (Cornerstones), the agency contracted to oversee A.G.'s case—the district court found there was clear and convincing evidence to support the allegations in the CINC petition and adjudicated A.G. to be in need of care. The court set the case plan for reintegration, giving Cornerstones discretion to increase visitation when appropriate but retained the order for any visitation to remain contingent on negative drug tests.

Mother objected to the initial proposed reintegration plan filed by Cornerstones, but the district court later adopted an updated version of the plan filed on February 10, 2021. Under the plan, Mother had to maintain consistent visitation with A.G., obtain stable housing and provide verification, notify Cornerstones if anyone residing at her home was not approved during overnight visits, ensure A.G.'s medical and dental needs were met, have access to transportation, refrain from using or possessing illegal drugs and submit to UA tests, provide verification of any prescription medications, avoid

2

associating with persons selling or using illegal drugs, obey all laws and notify Cornerstones of any law enforcement contact, maintain regular contact with Cornerstones and be truthful in communications, discuss problems or difficulties in working the plan, sign releases of information, complete a RADAC assessment and follow recommendations, complete a parenting class, complete a mental health assessment and follow the recommendations, and participate in family therapy with A.G.

At the same hearing in which the district court adopted the reintegration plan, the court reiterated its previous order that visitation remained contingent on negative drug tests and that Cornerstones would have discretion as to "duration, frequency and format."

Following a review hearing on June 1, 2021, the district court entered an order adopting the recommendations from a Cornerstones report filed on May 26, 2021. That report revealed visitation with Mother had not occurred since July 13, 2020, because of Mother not submitting UA results as required. The report noted Mother was a "no call no show" for every weekly UA test between January 7, 2021, and May 13, 2021, except for one—and that test result, which occurred on February 9, 2021, was positive for THC. Likewise, the report showed that A.G.'s therapist "recommended no visitation at this time until [Mother] is providing consistent UA's and can be present for visitation and not scheduling visitation and no showing to the visit. Individual therapist verbalizes that [A.G.] was displaying anxiety around visitation with [Mother] due to her inconsistent attendance when it was scheduled." The report also noted Mother was not compliant with the requirement to stay in regular monthly contact with Cornerstones.

Following a review hearing on September 7, 2021, the district court scheduled an evidentiary hearing for October 19, 2021, to address Mother's objections to the reintegration plan. Mother was not present at the October hearing, but her attorney informed the court that the concerns with the reintegration plan were resolved and an evidentiary hearing was no longer needed. At the hearing the court also admitted into

evidence another report from A.G.'s therapist, which explained A.G. had been diagnosed with adjustment disorder, unspecified due to

> "ongoing uncertainty of if or when she will see her natural parents again due to their inconsistency in meeting the requirements of visitations. It is important to note that this level of uncertainty and inconsistency can create ongoing trauma and also may impact the rate and level of a child's ability to make progress in therapy."

Following a permanency hearing on January 18, 2022, the district court found Mother's progress at achieving permanency was inadequate. Two weeks later, at a permanency hearing on February 1, 2022, the district court found reintegration was no longer viable and ordered the State to move for termination of Mother's parental rights.

The State moved for termination of parental rights on February 28, 2022. It alleged Mother was unfit as a parent for the following statutory factors: K.S.A. 38-2269(b)(2) (conduct toward the child of a physically, emotionally, or sexually cruel or abusive nature); K.S.A. 38-2269(b)(3) (use of intoxicating liquors or narcotic or dangerous drugs of such duration or nature as to render parent unable to care for the ongoing physical, mental, or emotional needs of the child); K.S.A. 38-2269(b)(4) (physical, mental, or emotional neglect of the child); K.S.A. 38-2269(b)(8) (lack of effort to adjust circumstances, conduct, or conditions to meet the needs of the child); K.S.A. 38-2269(c)(2) (failure to maintain regular visitation, contact, or communication with the child or the custodian of the child); and K.S.A. 38-2269(c)(3) (failure to carry out a reasonable plan approved by the court directed toward the reintegration of the child into the parental home).

Two witnesses testified at the termination hearing on June 6, 2022: Mother and Jerica Owens, the Cornerstones case worker assigned to the case. Owens' testimony covered Mother's efforts at completing tasks on the case plan, with varying levels of

success. For instance, Mother completed two RADAC assessments as required in the reintegration plan, but as of the termination hearing had not yet followed the recommendations—such as an outpatient drug treatment program—from the most recent RADAC assessment. Mother testified she was scheduled to begin that program the week following the termination hearing and would have begun it that day if the termination hearing were not being held. Mother also completed a Love and Logic parenting class in June 2020 and a mental health assessment in September 2021 without further recommendations.

Owens testified that Mother had not yet provided verification of her housing and utilities, but she generally knew that Mother lived in a house in Atchison. Mother told Owens she could not provide verification because her name was not attached to the lease or utilities. While Mother told Owens she was self-employed in a handyman business, she never provided tax returns or letters to verify that employment or her income. Owens discussed with Mother the need to provide this verification and ways Mother could do it numerous times. Mother admitted she had known "for years" that she needed to provide these letters, but it was just within the week before the hearing that she was able to provide them.

The primary concern for Owens was Mother's lack of visitation, which stemmed from her failure to submit consistent negative UA results. Owens testified—and Mother acknowledged—that the last time Mother saw A.G. was July 13, 2020. Owens began working the case in October 2020, at which time Mother was not having visits because of a lack of UA tests and a recommendation by A.G.'s therapist that visitation did not occur because of Mother's inconsistent UA tests. Owens had trouble contacting Mother at first because the previous case worker had given Owens an incorrect phone number, but that issue was fixed in December 2020 once Mother contacted Cornerstones. Mother acknowledged that visits were contingent on negative UA results but said she had trouble contacting Owens even when testing negative.

As of the termination hearing, Owens estimated Mother had only taken 22 out of 103 UA tests offered over the course of approximately two years. Mother said she missed most of the UA tests due to lack of transportation. Based on the court reports and testimony available in the record, Mother's UA results can be accounted for as follows:

- February 4, 2020 – positive
- February 13, 2020 – positive
- February 9, 2021 – positive
- August 30 through September 7, 2021 – negative
- September 24 through October 7, 2021 – three consecutive negatives
- October 29, 2021 – negative
- February 15 to March 15, 2022 – four consecutive negatives
- March 24, 2022 – positive
- April 1 to May 11, 2022 – seven consecutive negatives
- May 16, 2022 – negative
- May 24, 2022 – positive
- June 3, 2022 – negative

As for the two positive UA results in February 2020, Mother said those occurred from using "legal CBD products that are sold in the state of Kansas." Because of the COVID-19 pandemic, no testing occurred from about mid-March 2020 until about July 2020, shortly after Mother's last visit with A.G. Although not confirmed by any UA results, Owens said Mother reported using THC in July 2020—which would have been around the time Mother said she took a trip to Colorado for her birthday after a previous case worker told Mother she would be unable to see A.G. Mother said she did not submit any UA test results until February 2021 because she was trying to keep her contracting business afloat through the COVID-19 pandemic and often arrived home too late to go to the testing center before it closed. Mother said the positive UA test in February 2021

6

occurred because she was using a CBD vape pen that "was supposed to be THC free" as a measure to stop smoking cigarettes.

Mother said she had no "legitimate reason" for missing the UA tests between February 2021 and April 2021, but she explained that she had no transportation for later tests because the two vehicles she had access to were totaled in vehicle accidents in May 2021. Mother then moved to Atchison in June 2021, after which she said she was awaiting confirmation from Owens until the end of August 2021 that the UA tests could be transferred to Atchison.

Mother submitted a negative UA result at the end of August 2021 and another a week later at the beginning of September 2021, but Owens said Mother did not have a visit at that time because A.G.'s therapist recommended visitation remain suspended until Mother could provide a more consistent pattern of negative UA test results (i.e., more than two in a row). In Owens' words, A.G.'s therapist believed "another no show, which would cause a miss in visitation, that it would not be mentally healthy for [A.G.] and the progress that she has made." Mother's next scheduled UA test was a no call no show on September 17, 2021.

Following that no show, Mother had three consecutive negative UA results with the last on October 7, 2021. According to Owens, Mother did not have a visit then because Mother's attorney had requested doing visits at a CASA office in Platte City, Missouri—a halfway point between Mother's residence and A.G.'s placement with her maternal grandmother—but there was no CASA office available there. Owens said she contacted Mother to ask about doing visits in Independence, Missouri, but Mother said that would be too far to travel. Mother missed UA tests from then until February 2022, which she explained occurred because her family had only one working vehicle at the time and she could not walk to the testing facility as she was nine months pregnant and then recovering from a C-section.

Mother had a positive UA result on March 24, 2022, as indicated by the district court when reviewing a court report file-stamped March 31, 2022. That same court report showed Mother submitted four negative UA results preceding that positive result between February 15, 2022, and March 15, 2022. There was no testimony offered at the hearing as to why Mother did not have visits during this period, but the court report also specified Mother believed she had COVID at the time.

Owens said Mother submitted negative UA results from April 1, 2022, to May 16, 2022, during which time Mother submitted eight consecutive negative UA results. Owens said she contacted Mother to set up visits in Leavenworth, but Mother responded that she had no vehicle and asked if the visits could occur in Atchison. Owens put in a referral to the Atchison CASA office, but the office did not have staff available to supervise the visit since the case came from outside the county. Owens relayed that information to Mother and her attorney but did not receive a response.

Mother believed the UA result on May 24, 2022, was a false positive because she had tested negative in the weeks before and after. Mother said she had taken an acetaminophen-based cold medicine because she had been sick, along with Excedrin for a migraine. When Mother realized she had a positive UA result, she claimed she asked for an alternative method of testing and was told there were none. After contacting her attorney, Mother asked to take the UA test again later that week but "never got anywhere with it" and said she would not have had the money to spend on another drug test anyway.

After hearing the evidence and the parties' arguments, the district court announced its ruling terminating Mother's parental rights. First, the court noted it would not consider the allegations of abuse in making its decision since no evidence had been provided at the hearing about that allegation. Then the court said it would not place a lot of significance on certain issues, like the lack of verification of housing and utilities, and found evidence

showed Mother had completed some aspects of the case plan. But the court took a different view of Mother's lack of visitation and failure to complete her UA test requirements.

The district court emphasized that Mother had not seen A.G. since July 13, 2020, which was almost two years before the hearing. It recounted that of the 103 UA tests offered, Mother only showed up for 22 of the tests. And she tested positive five times, including at the beginning, middle, and end of the case. The court noted the agreed reintegration plan required Mother to have sufficient access to transportation to get to all necessary appointments and visits and found Mother's lack of transportation and failure to take UA tests was not due to lack of income. Instead, it found Mother's choices throughout the case were the cause. The court recounted how Mother did not seek other employment and never provided verification of any income or tax returns. The court also pointed out that Mother had chosen to move further away from the child—to Atchison— during the case, which made it more difficult for Mother to complete her plan requirements. Although Atchison was further from A.G., Mother admitted she lived 0.8 of a mile from the UA testing facility at that time, which the court estimated was about six or seven blocks from Mother's home. The court acknowledged Mother's claim that she could not walk to the facility to take UA tests between November 2021 and February 2022 due to weather, but pointed out the weather was not prohibitive every day during that time frame.

Thus, the district court found Mother had failed to maintain regular visitation, contact, or communication with the child or with the custodian of the child under K.S.A. 38-2269(c)(2). Likewise, the court found based on Mother's failure to complete UA tests to maintain contact with A.G., along with failing to follow the RADAC assessment recommendations or maintain access to transportation, that Mother failed to carry out a reasonable reintegration plan under K.S.A. 38-2269(c)(3). Based on these findings, the court found the State had proven by clear and convincing evidence that Mother was unfit

9

as a parent and that the condition is unlikely to change in the foreseeable future. The district court also concluded the termination of Mother's parental rights is in the best interests of the child due to

> "the length of time we've gone without contact with the minor child and the inability as we've moved forward, and the Court is concerned about the ability to continue to have . . . negative tests for UA or to comply with the requirement for testing, and . . . ultimately, that it would be harmful to the minor child."

After the hearing, the district court entered a journal entry memorializing its findings.

Mother timely appealed.

## ANALYSIS

A parent has a constitutionally protected liberty interest in the relationship with their children. *Santosky v. Kramer*, 455 U.S. 745, 753, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Before terminating parental rights, Kansas law requires a district court to find the State has proved the parent is unfit, the conduct or condition that renders the parent unfit is unlikely to change in the foreseeable future, and termination of parental rights is in the child's best interests. K.S.A. 38-2269(a), (g)(1). Because of the fundamental nature of this right, the State must prove any findings relating to a parent's unfitness by clear and convincing evidence. K.S.A. 38-2269(a); *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014).

When reviewing a finding of parental unfitness, we must determine whether the evidence viewed in the light most favorable to the State is sufficient to support the district court's decision—that is, whether a rational fact-finder could have found it highly

probable that the parent was unfit. *In re B.D.-Y.*, 286 Kan. 686, Syl. ¶ 4. Appellate courts do not reweigh conflicting evidence, pass on the credibility of witnesses, or otherwise independently decide disputed questions of fact. 286 Kan. at 705. If a district court finds a parent is unfit, the court must then determine whether the parent's unfitness is likely to change in the foreseeable future. K.S.A. 38-2269(a). A court evaluates the foreseeable future from a child's perspective because children have a different perception of time. *In re R.S.*, 50 Kan. App. 2d at 1117. For a child, "a month or a year seem[s] considerably longer than it would for an adult." *In re M.S.*, 56 Kan. App. 2d 1247, 1263, 447 P.3d 994 (2019); see K.S.A. 38-2201(b)(4).

*Unfitness*

When considering a parent's unfitness, the district court is statutorily required to consider a list of several factors but is not limited to only those factors. K.S.A. 38-2269(b). A single factor can establish a parent's unfitness, but the presence of a factor does not automatically establish unfitness. K.S.A. 38-2269(f). In concluding that Mother was unfit, the district court relied on two statutory factors:  K.S.A. 38-2269(c)(2) and (c)(3). We will examine each under the standards as outlined above.

a. *Failure to maintain visitation, contact, or communication*

First, we address the district court's finding of unfitness under K.S.A. 38-2269(c)(2). Although Mother does not dispute the evidence showing she had no visits for nearly two years as of the termination hearing, she argues Cornerstones unreasonably denied visitation based on another requirement beyond the district court's orders. In other words, Mother claims there was not clear and convincing evidence to support a finding of unfitness based on K.S.A. 38-2269(c)(2) because she fully complied with the court's orders regarding visitation. Her argument is not persuasive.

To begin, Mother misunderstands the district court's order regarding visitation. She alleges she was only required to provide two consecutive negative UA tests before being allowed visitation, but Cornerstones "went rogue outside the Court's orders and layered on an additional requirement that any visits also be recommended by A.G.'s therapist." Yet the court gave Cornerstones "discretion for [the] duration, frequency and format" of visitation and made "[a]ll visitation . . . contingent upon negative drug tests."

The first time Mother provided two consecutive negative UA tests (within the week of August 30 through September 7, 2021), Cornerstones denied visitation based on the therapist's recommendation that Mother provide more of a consistent pattern of negative UA tests (i.e., more than two in a row). Mother then did not appear for her next UA test on September 17, 2021. After Mother had three consecutive negative UA tests between September 24, 2021, and October 7, 2021, Owens discussed visitation with Mother's attorney. But Owens testified she could not accommodate Mother's request that visitation be moved to Platte City, and Mother did not agree to move it to Independence, Missouri. Mother then missed her next two UA tests, provided a negative test on October 29, 2021, and then did not appear for a UA test again until February 15, 2022. Mother's compliance with the UA test requirement was again sporadic through March 24, 2022, at which time she tested positive. And after she began providing consecutive negative tests in April, Owens raised the issue of visitation again, but at that time Mother wanted it moved to Atchison which was not feasible.

Mother's inconsistency at submitting consecutive negative UA results directly impacted her ability to have visits throughout the duration of the case. Again, even though Cornerstones tried to work with Mother to schedule visits after she managed to more consistently submit negative UA results, visitation did not occur either because Mother stopped responding to Owens or due to her travel limitations (which the district court found were in large part self-imposed). Overall, Mother missed about 79 percent of

12

the UA tests offered, and the only period of any consistency occurred in the months just before the termination hearing.

In short, we find there was clear and convincing evidence to support the district court's finding of unfitness that Mother failed to maintain regular visitation, contact, or communication with her child. We see no error in this finding.

b. *Failure to carry out a reasonable reintegration plan*

We next address the district court's finding of unfitness under K.S.A. 38-2269(c)(3). As Mother notes, the district court found Mother's failure to carry out specific aspects of the case plan supported this finding, including: (1) maintaining contact with A.G.; (2) submitting UA test results; (3) following the recommendations from the RADAC assessment; and (4) maintaining access to transportation. Mother argues the district court erred in relying on her failure to complete these tasks in light of her successful efforts at completing other aspects of the reintegration plan. This argument is not convincing.

Mother begins by asserting that communication issues and administrative failures by Cornerstones were held against her, yet the examples she raises are either contradicted by the record or irrelevant to the district court's findings. For instance, while Owens testified about having an incorrect phone number for Mother at the beginning of her involvement in the case, the record shows that issue was cleared up before the court adopted the reintegration plan and nearly 18 months before the termination hearing. And Mother asserts she was never told to complete outpatient treatment yet acknowledges that she signed up to begin that process a week after the termination hearing. Mother also points out that Owens misunderstood aspects of the case plan, such as including anger management classes as a task despite not being part of the adopted reintegration plan. But

the district court specifically stated it did not consider Mother's failure to complete anger management since that was never made part of the reintegration plan.

Mother concedes that she did not have any visits with A.G. since July 2020, reiterating her belief that Cornerstones refused to schedule visits even though she complied with the court's orders. Mother also repeats her claim that the most recent positive UA result was a false positive and challenges the reliability of all the UA records based on a single negative result being mislabeled as a no call no show. As discussed above, Cornerstones had discretion to determine Mother's eligibility for visitation, which was contingent upon consistent negative UA results. Again, Mother missed about 79 percent of the UA tests offered and had five positive drug tests throughout the case. Even if we ignore the alleged false positive and discount the mislabeled result, Mother offers nothing to discredit all the UA records. We find there is clear and convincing evidence she failed to complete this aspect of the case plan.

Lastly, although it was not the primary basis for the district court's determination that Mother was unfit, Mother argues the district court erred in finding she failed to maintain access to transportation because she testified that she had adequate access to transportation at the time of the termination hearing. Yet Owens testified she never received any verification of access to transportation from Mother. Furthermore, Mother fails to address the court's finding that her lack of access to transportation throughout the case was not due to lack of income but, instead, Mother's choices. Although this finding was not the primary reason, Mother also ignores the court's finding that she could have walked to the UA testing facility after moving to Atchison since she lived less than a mile away. In fact, Mother testified at the hearing that it only took her 30 minutes to walk there. We find there was clear and convincing evidence to support a finding of unfitness based on Mother's failure to complete a reintegration plan and see no error in the court's finding.

14

*Foreseeable future*

Because the district court's findings about Mother's unfitness are connected, we will consider those factors together. Mother argues the district court did not properly weigh her recent efforts in making its decision and compares her case to *In re K.R.*, 43 Kan. App. 2d 891, 233 P.2d 746 (2010). In that case, the panel reversed a termination of parental rights where the only evidence in the record on point showed that the mother had made "substantial progress toward all conditions of reintegration" and could achieve reintegration in six months. 43 Kan. App. 2d at 902. In other words, the panel concluded the State failed to present clear and convincing evidence that the mother's unfitness was unlikely to change in the foreseeable future. 43 Kan. App. 2d at 902-03.

Mother suggests her case resembles *In re K.R.* because there is evidence to prove her recent positive efforts toward reintegration, such as submitting consistent negative UA results that would allow visits, scheduling the outpatient treatment as recommended by the RADAC assessment, and obtaining transportation. But Mother's reliance on *In re K.R.* is misplaced because our focus is not limited to the favorable evidence she mentions in her brief. When assessing whether Mother's unfitness was unlikely to change in the foreseeable future, a court may look at a parent's past conduct as a predictor of future behavior. *In re K.L.B.*, 56 Kan. App. 2d 429, 447, 431 P.3d 883 (2018).

Here, the district court concluded Mother's unfitness was unlikely to change in the foreseeable future mainly because Mother tested positive for THC twice in the months just before the termination hearing, noting also that Mother had only claimed the more recent result was a false positive. Given Mother's past failures to submit UA testing and her other positive results, it was not unreasonable for the district court to remain skeptical of Mother's willingness to continue those sustained efforts. A.G. had been in DCF custody for nearly 19 months by the time Mother submitted her first negative UA results at the end of August 2021. At that point, Mother had not seen A.G. in more than a year.

15

While Mother kept submitting UA results for the next month or so, she then had another four-month period of noncompliance. And although Mother managed to submit UA tests consistently between the State moving to terminate Mother's parental rights and the termination hearing—a little over three months—the positive test results support the district court's conclusion that her past conduct could indicate her future behavior.

As a result, we find the record contains clear and convincing evidence to support the district court's conclusion that Mother would continue to remain unfit for the foreseeable future.

*Best interests*

Upon making a finding of parental unfitness, "the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child." K.S.A. 38-2269(g)(1). In making such a decision, the court shall give primary consideration to the physical, mental, and emotional needs of the child. K.S.A. 38-2269(g)(1). The district court makes the best-interests determination based on a preponderance of the evidence, which we review on appeal for an abuse of judicial discretion. *In re R.S.*, 50 Kan. App. 2d at 1115-16. A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *In re Spradling*, 315 Kan. 552, 590, 509 P.3d 483 (2022). The party asserting error bears the burden of establishing an abuse of discretion. *Bicknell v. Kansas Dept. of Revenue*, 315 Kan. 451, 466, 509 P.3d 1211 (2022).

Mother challenges the district court's best-interests determination by arguing she "objectively demonstrated a strong desire to regain custody" through substantial compliance with the reintegration plan. Yet Mother points to no specific factual or legal error in the district court's decision, so we are left with determining whether any

16

reasonable court would agree with the court's decision. We find a reasonable person would agree Mother's parental rights should be terminated based on the testimony and evidence presented on the record below. Although Mother suggests A.G. is "still of a young age," A.G. has spent nearly a third of her life in DCF custody while this case was pending.

As a final point, we recognize Mother's desires to regain custody and do not discount her positive intentions in taking steps necessary to achieve reintegration. "But we must judge these cases based mostly upon actions, not intentions, and we must keep in mind that a child deserves to have some final resolution within a time frame that is appropriate from that child's sense of time." *In re A.A.*, 38 Kan. App. 2d 1100, 1105, 176 P.3d 237 (2008). As the district court explained, it was Mother's choice not to submit UA results that prevented her from visiting her child or completing the reintegration plan. Put simply, Mother failed to address concerns of which she was well aware, that if addressed would have allowed visitation to occur. The district court did not abuse its discretion in finding termination of Mother's parental rights was in the best interests of A.G. As a result, we affirm the district court's decision to terminate Mother's parental rights.

Affirmed.